No. 29,998.

Charles W. Johnson, Receiver of the Farmers and Merchants Bank, *Appellant,* v. Peter J. P. Schrag, *Appellee.*

(4 P. 2d 450.)

*James A. Cassler* and *James L. Galle,* both of McPherson, for the appellant.

*J. N. Tincher, Don Shaffer* and *Clyde A. Raleigh,* all of Hutchinson, for the appellee.

The opinion of the court was delivered by

HUTCHISON, J.: This action was upon a·note given by the defendant·to the plaintiff bank. The answer was want of consideration and obtaining the note by means of misrepresentations and fraud on the part of an officer of the plaintiff bank by which the bank received and retained a benefit. A jury was waived, the case was tried to the court, and judgment was rendered for defendant. During the trial of the cause the plaintiff bank failed and the cause was revived in the name of the receiver, who appeals from the adverse judgment.

The defendant gave his note payable in one year at six per cent interest to the plaintiff bank for a loan of $1,500 for the purpose of purchasing twenty shares of stock in a life insurance company of the face value of $10 per share. The full amount was deposited to his credit in the bank and later he issued his check to one Speery for $1,500 and received the certificate of stock for twenty shares issued in his name.

Two grounds of reversal are forcibly urged by the appellant: First, that there was not sufficient evidence to support the finding of the court in favor of the defendant; and, second, that the trial court failed to recognize the fact that the matter in issue involved two separate and distinct transactions, one the loan of money, and the other a sale of stock, the plaintiff bank participating in the first transaction but not in the second.

Speery and Bailey were stock salesmen endeavoring to sell this stock to defendant, who refused to consider the proposition until he could consult with and obtain the advice of some banker who would know something about the worth of such stock. The next day the president of the plaintiff bank went out with them to defendant's place but he was not at home, but on the way back they

met him and arranged for him to go to the bank the following day. He went to the bank the next day and asked the president of the bank if he knew anything about this insurance stock these men were trying to sell him. From here on there is a serious conflict in the evidence as to what was said and part of what was done, but the evidence of the defendant tends to prove that the president of the bank said if it were gas, oil or mining stock he would advise him to keep his fingers off of it, but as it was life insurance stock it was all right. He explained in detail about the stock. Defendant said he asked the president why the owners of the stock did not keep it if it was so good. He said they were hard up and needed the money. Defendant said while he and the president were talking Bailey came up and told of a big dividend to be due on the stock about the first of the year. He then inquired of the president if he could borrow the money to purchase it, and was told he could at eight per cent interest. He refused to pay more than six per cent and Speery, standing near, said he would pay the difference, or $30, and gave his check to the bank for that amount. Defendant says he then told the president he would buy the stock. The president then showed him the stock under consideration, which was in the name of Speery, and showed its face value to be $10 per share. Defendant then asked why he should pay $75 per share for stock of $10 face value, and the president is said to have answered, it was just like buying an improved farm, that he had to pay for the improvements. Defendant testified he did not know who owned the stock until after he had promised the president he would take it. Six days later the president gave him the certificate of stock and he gave the president his check for $1,500 in favor of Speery. The defendant testified that he made the transaction with the president in buying the stock, and that he relied upon his advice and opinion in making the purchase.

Evidence was introduced to the effect that the stock in question was worth at the time of the sale various amounts running from $17.50 to $22.50 per share.

It is not for the reviewing court to weigh the conflicting testimony, as counsel for appellant frankly concedes, and if the testimony of the defendant is given credence, as it was by the trial court, we have no difficulty in finding it was sufficient to sustain such finding.

Were there two separate and distinct transactions—a loan and a purchase of stock? If the evidence of the defense is to be fully

credited, they were not separate transactions, but were closely connected, and the president of the bank was actively participating in both features or elements. The recommendation of the purchase of stock for $75 per share that was worth at the time not to exceed $22.50 per share amounts to a misrepresentation and fraud, and when such advice and opinion are given in connection with the making of a loan for the purchase of the same, and the transfer of the stock and the payment of the purchase price are all handled by the same party, the two features of the transaction cannot be regarded as separate and distinct.

It is urged that whatever was said by the bank president was a mere expression of opinion which should not make him liable, and much less the bank, because his statement was beyond any authority granted him as agent of the bank and besides, the bank was not authorized to engage or be interested in the sale of stock.

In the case of *Shriver v. National Bank et al.*, 117 Kan. 638, 232 Pac. 1062, where a letter was written by the bank president highly commending the corporation selling preferred stock, when he had superior knowledge and means of knowledge of the financial condition of the company, it was held to be a representation of fact that the opinion expressed existed, and a verdict and judgment against the bank on such facts were approved.

Of course, it is well established that "a bank cannot be held liable for the unauthorized transactions of its officers unless it actually receives and retains the benefit of such transactions." (*Discount Co. v. Bank,* 101 Kan. 253, syl. ¶ 2, 166 Pac. 476.)

In the case of *Bank v. Wilson,* 101 Kan. 72, 165 Pac. 859, the vice president of the bank conducted by correspondence a negotiation for the sale of real property and the delivery of the deed upon certain conditions and received for such services the sum of twenty dollars, and it was there held that—

"Banks, like individuals, are liable for the wrongs which they commit and the injuries which they cause. In a consummated transaction, wherein it gained an advantage and occasioned an injury and loss to defendant, it cannot defend by saying that it exceeded its charter powers when it made the agreement and undertook to perform it. It is not permitted to enjoy the benefits of a transaction like this, even if it be not strictly within the business of banking nor incidental to it, and escape liability upon the ground that its acts were *ultra vires.*" (p. 75.)

It was held in the case of *Farmers State Bank v. Brenneke,* 118 Kan. 251, 240 Pac. 395, that—

"A banking corporation organized under the laws of this state is not liable for any representation made by its cashier to the maker of a promissory note to procure his signature thereto where the note is given to a third person and where the bank is not benefited thereby, but evidence to show such representations may be considered by the jury to determine whether or not the bank had notice of the fraud at the time it became the holder of the note." (Syl. ¶ 4.)

In the case at bar the bank became the holder of the note in question at the very time of the making of the representations, and it received and retained a direct benefit of $30 interest paid by Speery at the time of making of the loan to the defendant. By the acceptance of this $30 advance payment of interest, to say nothing of the supposed benefit of new business in the form of an acceptable note for $1,500 at six per cent interest payable in a year, which was in the line of business of the bank, the plaintiff bank is not, under these authorities, in a position to insist upon the want of authority of the bank, or the matter of the unauthorized act of the president, to relieve it from liability for misrepresentations made by its president. (See, also, in this connection, the case of *Abmeyer v. Bank,* 103 Kan. 356, 179 Pac. 368.)

It is said the president did not have or possess a superior knowledge or means of knowledge as to the worth, value or merits of stock in the life insurance company. But the evidence shows he owned stock in another life insurance company and said since it was stock in a life insurance company it was all right.

We think the statements and opinion given by the president of the plaintiff bank to the defendant were misstatements of fact by one who had means of a superior knowledge of the facts and that such statements were misleading and that the bank received and retained a benefit from the transaction, and therefore it cannot under the finding of the trial court recover from the defendant on the note executed and delivered by the defendant in reliance upon such statements and opinion.

The judgment is affirmed.